# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

TROY WILSON,

                      Plaintiff,               :    Case No. 3:14-cv-310

   - vs -

                                        Magistrate Judge Michael R. Merz

DYNASPLINT SYSTEMS, INC.,  :

                      Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is before the Court on Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b) (ECF No. 32). Plaintiff filed a Memorandum in Opposition (ECF No. 34) and Defendants filed a Reply (ECF No. 35). The matter is now ripe for decision.

The parties unanimously consented to plenary magistrate judge jurisdiction under 28 U.S.C. § 636(c) in their Rule 26(f) Report (Doc. No. 18) and Judge Rice has referred the case on that basis (Doc. No. 19).

This action arises under 29 U.S.C. § 2601 et seq. (Complaint, Doc. No. 1 PageID 1). The Court is asserted to have jurisdiction under Title 29 U.S.C. § 2617. *Id.* The subject matter jurisdiction is not contested.

**Statement of Facts**

It is uncontested that Plaintiff, Troy Wilson, a resident of Ohio, was employed by Defendant Dynasplint Systems, Inc., a Maryland corporation, as a sales Consultant in its Southern Ohio Dayton-Cincinnati region (Complaint, ECF No. 1, PageID 1-2, ¶¶ 1, 2, 7, 8); (Answer, ECF No. 22, PageID 159-160, ¶¶ 1, 2, 7, 8); (Motion for Summary Judgment, ECF No. 32, PageID 414-415).  Plaintiff began his employment with Dynasplint in December 2011, demonstrating and fitting patients with Dynasplint's product of bilateral spring loaded tensioning devices designed to help increase joint range of motion (Complaint, ECF No. 1, PageID 2, ¶ 9); (Answer, ECF No. 22, PageID 160, ¶ 9); (Motion for Summary Judgment, ECF No. 32, PageID 415).  Likewise neither party contests that there was a difference in personalities between Wilson and his immediate supervisor, Tim Blair (Complaint, ECF No. 1, PageID 2, ¶¶ 11-14); (Answer, ECF No. 22, PageID 160, ¶¶ 12, 13); (Wilson Depo., ECF No. 31, PageID 216).  Blair's supervisor, Scott Herman, was reassigned as Wilson's supervisor, but after a short time period, the supervisory role was given back to Blair (Complaint, ECF No. 1, PageID 2, ¶¶ 12-13); (Motion for Summary Judgment, ECF No. 32, PageID 415).

Plaintiff and his partner were expecting a child in the middle of March, 2013.  On February 19, 2013, during what was expected to be a routine prenatal visit, Wilson's girlfriend was admitted into the hospital with complications arising from preeclampsia (Complaint, ECF No. 1, PageID 3, ¶¶ 16-18).  The mother was induced and the baby was born three weeks prematurely on February 21, 2013 (Complaint, ECF No. 1, PageID 2, ¶ 18).

Blair planned on doing a ride-along with Wilson on February 20, 2013, to observe Wilson's sales calls and fittings.  He had made several attempts throughout a four-day period to

contact Wilson to confirm the ride along, including phone calls and an email, without a response (Blair Email dated February 19, 2013, ECF No. 31-1, PageID 373); (Blair Email dated February 20, 2013, ECF No. 13-1, PageID 374); (Wilson Depo., ECF No. 31, PageID 245).  Finally, at approximately 9:00 p.m., February 19, 2013, Wilson responded via email that Blair would "probably want to check with me and CONFIRM next time.  We are in labor and delivery. There is no way we will be riding together tomorrow." (ECF No. 31-1, PageID 373)(emphasis in original.)

Wilson was terminated from Dynasplint on February 20, 2013 (Complaint, ECF No. 1, PageID 3, ¶ 22); (Motion for Summary Judgment, ECF No. 32, PageID 415).

The area of contention arises out of whether or not Wilson provided notice to his supervisor as to the medical emergency and did so in a manner sufficient to convey that Wilson needed FMLA time and if so, whether he was wrongfully terminated in retaliation.  Plaintiff alleges that he "immediately provided notice to his supervisor Tim Blair regarding the quick developments of the medical complications" and again informed Blair of the emergency situation after Blair notified Wilson that he would be in Dayton to do a "ride along" to observe Wilson's work on February 20, 2013 (Complaint, ECF No. 1, PageID 3, ¶¶ 19-21).  Defendant however counters that Wilson was performing below expectations and had been put on notice of that. Further, Defendant argues that, as the termination had begun prior to the medical emergency, and/or they did not receive proper notice of the emergency, Plaintiff's FMLA rights were not triggered.

Plaintiff filed his Complaint raising his FMLA violation on September 18, 2014 (ECF No. 1).  A summons was issued a week later and returned executed in January of 2015 (ECF

Nos. 2, 4). At that point Plaintiff filed several Motions for Default Judgment (February 10, 2015, March 17, 2015, and July 7, 2015) (ECF Nos. 4, 5, 9), as well as an Application to the Clerk for Default Judgment on April 1, 2015 (ECF No. 7). The Clerk entered the default Judgment on April 2, 2015 (ECF No. 8). Several months after default had been entered, Defendants filed a Motion to Set Aside Default arguing that through internal error, the entry of default had been rendered prior to the decision maker at Dynasplint realizing that they had been properly served (Motion, ECF No. 14, PageID 39); (Response, ECF No. 15); (Reply, ECF No. 16). Defendant further argued that 1) there would be no unfair prejudice to the plaintiff if this matter were permitted to move forward on the merits 2) Dynasplint has a meritorious defense to the FMLA claims, and 3) Dynasplint acted in good faith at all times. *Id.* at 39-40. The District Court entered a Decision Sustaining the Motion to Set Aside Entry of Default (ECF No. 17). Once permitted to proceed, Defendant filed an Answer to Plaintiff's Complaint (ECF No. 22) and later a Motion for Summary Judgment (ECF No. 32); (Response, ECF No. 34); (Reply, ECF No. 35).

**Applicable General Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless,

"the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-250 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992), *quoting Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United*

*States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323; *see also*, *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Alexander v. Caresource*, 576 F.3d 551 (6th Cir. 2009), *citing Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F.2d 606 (6th Cir. 1992).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

6

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008); *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994), *quoting Liberty Lobby*, 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds*, 536 U.S. 639 (2002). Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also*, *Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street*, 886 F.2d at 1479. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252. If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

# Analysis

The Family Medical Leave Act ("FMLA") allows qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves- (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  Under 29 U.S.C. § 2615(a)(1) it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise [the] right" to such leave.  Further, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2); *See Gipson v. Vought Aircraft Industries*, 387 Fed. Appx. 548, 555 (6th Cir. 2010). Employers who violate § 2615 are "liable to any eligible employee affected" for damages and appropriate equitable relief. 29 U.S.C. § 2617(a)(1); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

If the need is foreseeable, such as FMLA  "based on an expected birth . . . [the employee] shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave." 29 U.S.C. § 2612(e)(1); 29 CFR 825.302(a); *Morr v. Kamco Indus.*, 548 F. Supp. 2d 472, 477 (N.D. Ohio 2008).

When the need for FMLA leave is unforeseeable, the relevant regulations require that an employee should give notice to the employer of the need for FMLA leave "as soon as

practicable" under the facts and circumstances of the particular case. 29 CFR 825.302 ("If 30

days notice is not practicable, such as because of a lack of knowledge of approximately when

leave will be required to begin, a change in circumstances, or a medical emergency, notice must

be given as soon as practicable.)  It is expected that an employee will give notice to the employer

within no more than one or two working days of learning of the need for leave, except in

extraordinary circumstances where such notice is not feasible. 29 C.F.R. § 825.303(a).  The

regulations further provide:

> (c) *An employee shall provide at least verbal notice sufficient to*
> *make the employer aware that the employee needs FMLA-*
> *qualifying leave, and the anticipated timing and duration of the*
> *leave.*  The employee need not expressly assert rights under the
> FMLA, but may only state that leave is needed for an expected
> birth or adoption, for example.  The employer should inquire
> further of the employee if it is necessary to have more information
> about whether FMLA leave is being sought by the employee, and
> obtain the necessary details of the leave to be taken.  In the case of
> medical conditions, the employer may find it necessary to inquire
> further to determine if the leave is because of a serious health
> condition and may request medical certification to support the need
> for such leave (see § 825.305).

29 U.S.C. § 825.302(c)(emphasis added); *see also Morr v. Kamco Indus.*, 548 F. Supp. 2d 472,

477 (N.D. Ohio 2008).  The regulations are silent, however, regarding the effect of an

employee's failure to provide adequate notice of an unforeseen serious health condition.

To make a successful argument for FMLA interference, Wilson must demonstrate that:

(1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA;

(3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer

notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to

which he was entitled. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005), *quoting*

*Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012), *relying on Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008); *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006); *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

To establish a claim of unlawful retaliation under the FMLA a plaintiff must show (1) that "he availed himself of a protected right under the FMLA by notifying [his employer] of his intent to take leave," (2) that "he was adversely affected by an employment decision . . .," and (3) "a causal connection between his exercise of a right under the FMLA and the adverse employment decision." *Gipson*, 387 Fed. Appx. at 557, *quoting Skrjanc*, 272 F.3d at 314.

In the FMLA interference portion, the first three prongs are uncontested.  Rather, this portion turns on whether Wilson gave information sufficient to apprise the employer that he needed leave and that his request for leave was FMLA-qualifying. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004); *Brohm v. JH Properties, Inc.*, 149 F.3d 517 (6th Cir. 1998); *Reich v. Midwest Plastic Engineering, Inc.*, 1995 U.S. Dist. LEXIS 8772 (W.D. Mich. 1995).  In other words, "the information that the employee conveyed to the employer [must have been] reasonably adequate to apprise the employer of the employee's request to take leave *for a serious health condition* that rendered him *unable to perform his job.*" *Walton*, 424 F.3d at 486; *Brenneman*, 366 F.3d at 421.  "The eligible employee need not expressly mention the FMLA as the source of his right to request such leave," (29 C.F.R. § 825.303(b)) but it is critical that the "information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition" and "for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D)] has occurred.'" *Walton*, 424 F.3d at 486, *quoting Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999); *see*

*also Gipson*, 387 Fed. Appx. at 555, *quoting Walton*, 424 F.3d at 486 (*quoting Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999)). "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin*, 346 F.3d at 724 (*quoting Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)); *See, e.g., Gipson*, 387 Fed. Appx. 548 (despite the fact that the employer knew employee had a history of heart problems, employee failed to give sufficient notice to employer when he spoke vaguely of not feeling well, having a headache, and needing to take medicine); *Walton*, 424 F.3d at 486 (employee's statements that he was "sick" and had scheduled a doctor's appointment not sufficient notice); *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 311-12 (7th Cir. 2006) (employee's statement that she was "sick" and had been seen at health center not sufficient notice); *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998) (employee's mother's statements that employee "was sick," "was having a lot of pain in her side," and would not be able to work is not sufficient notice); *cf. Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (holding that notice *was* sufficient where employee informed employer that he had been in motorcycle accident which required hospitalization and that he would be unable to perform his job); *Seymour v. United States Postal Serv.*, 2010 U.S. Dist. LEXIS 28748, *17-28 (W.D. Tenn. 2010)(employee provided FMLA medical certification that his wife was pregnant and he wished to take leave after the birth to help care for his wife and child. This served as sufficient notice to employer despite the fact the child was born prior to its due date and thus the leave began prior to its previously pre-approved date).

The handbook given by Dynasplint Company to its employees states "When the need [for FMLA leave] is foreseeable, you shall be required to provide 30 days in advance notice of leave." (ECF No. 31-1, Exh 28, PageID 390); *See also* 29 U.S.C. § 2612(e)(1); 29 CFR

825.302(a); *Morr v. Kamco Indus*., 548 F. Supp. 2d 472, 477 (N.D. Ohio 2008)(Pursuant to 29 U.S.C. § 2612(e)(1), an employee seeking "foreseeable leave based on an expected birth . . . shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave.")   Wilson himself testified that he had not requested time off in advance, despite the baby's full term due date being only three weeks out (Wilson Depo., ECF No. 31, PageID 250).   Human Resource Generalist Tiffany Lolmaugh verified that "Troy Wilson did not request any FMLA forms at any time, nor did he advise me that he would need leave for the birth of his child in or about March 2013." (Lolmaugh Aff., ECF No. 14-5, PageID 92, ¶ 4.)   Blair's first knowledge of Wilson's absence was on February 19, when Wilson responded to one of several emails about Blair's efforts to contact him (Blair Aff., ECF No. 14-3, PageID 69, ¶¶ 14).

After Wilson's email (in which he stated that he and his girlfriend were in labor and delivery) had been forwarded to Karen Bruno of Human Resources, she questioned Blair and Herman whether they knew of "this life event? Has he [Wilson] requested time off?" (Email dated February 20, 2013)(ECF No. 32-1, PageID 440.)   In an email dated February 20, 2013, Blair responded that Wilson did not notify him in any way (ECF No. 32-1, PageID 442).   That same day Blair clarified that he was aware that Wilson's girlfriend was pregnant and that her due date was in March (Email dated February 20, 2013, ECF No. 32-1, PageID 443); (Blair Aff., ECF No. 14-3, PageID 68, ¶¶ 13).   Wilson however, did not say anything about seeking FMLA leave at either that time nor when he became aware that the child was going to be delivered early (Email dated February 20, 2013, ECF No. 32-1, PageID 443); (Blair Aff., ECF No. 14-3, PageID 68, ¶ 13); (Lolmaugh Aff., ECF No. 14-5, PageID 92, ¶¶ 1,4)   Further, Wilson did not respond to Blair's reply email dated February 20th which asked for an update of status and whether or not

Wilson had contacted the divisional office to advise them that he needed time off (Blair Aff., ECF No. 14-3, PageID 69, ¶ 15); (Wilson Depo., ECF No. 31, PageID 252) (does not recall responding to the email). Further, Herman averred that "I would have been made aware if Wilson had requested FMLA, but he did not do so." (Herman Aff., ECF No. 14-4, PageID 86, ¶ 10.) Herman continues to state that the company would have provided Wilson with FMLA had he given notice of the need for leave (Herman Aff., ECF No. 14-4, PageID 87, ¶ 12).

The birth of this child was a foreseeable medical event. Per FMLA statute and policies, as well as Dynasplint company policies, Wilson should have given at least a 30 day notice of his impending need for FMLA time. 29 U.S.C. § 2612(e)(1); 29 CFR 825.302(a) Yet all evidence shows that he failed provide his employer with advance notice of this FMLA-qualifying condition/event and intent to take leave.

Even assuming that the few weeks premature delivery of the child qualified under 29 CFR 825.302(a) as unforeseeable ("If 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable. For example, an employee's health condition may require leave to commence earlier than anticipated before the birth of a child . . ."), Wilson failed to provide notice as soon as it was practicable. While the Court recognizes the stress that Plaintiff, his girlfriend, and unborn child were under, it does not appear that this was an immediate life threatening scenario. Wilson and O'Brien both testified that O'Brien was admitted into labor and delivery for pre-eclampsia after a routine doctor's visit on February 19, 2013 (O'Brien Aff., ECF No. 34-2, PageID 461, ¶ 5); (Wilson Depo., ECF No. 31, PageID 247-248). However, it also appears that the condition was monitored for over 24 hours. (O'Brien Aff., ECF No. 34-2, PageID 462, ¶ 9) ("On Wednesday February 20, 2013, we

were told that I would be induced on Thursday, February 21st."); (Wilson Depo., ECF No. 31, PageID 249)(the baby was not born on February 19th.  The baby was born on the 21st.)  Yet again, the first indication anyone at Dynasplint had that Wilson was at the hospital waiting on the birth of his child was when he responded to Blair's email inquiring as to the status of the ride-along.   At that point, Blair (as the employer) inquired further of Wilson to obtain more information as to whether FMLA was being sought, including whether Wilson had alerted the divisional office, as well as an update on status (ECF No. 31-1, PageID 374)..  As previously stated, the regulations require an employee "provide at least *verbal* notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, *and the anticipated duration of the leave.*" 29 C.F.R. § 825.302(c).  Wilson failed to respond to Blair's inquiry, and remained out of communication until late afternoon on the 20th, and then reaching out only after he received an email advising him that his pay was frozen until he contacted Blair.  Further, from the records before this Court, it appears, Wilson failed to follow up with the divisional office.  Thus, he failed to give sufficient notification of his intent to take FMLA.

Even if Wilson *had* properly invoked his FMLA rights, no reasonable jury could find that there was a causal connection between that exercise of rights and his termination.

"An employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA." *Gipson v. Vought Aircraft Industries*, 387 Fed. Appx. 548, 557 (6th Cir. 2010), *citing Moorer v. Baptist Mem. Health Care Sys.*, 398 F.3d 469, 488-89 (6th Cir. 2005). "Where, as here, the employer claims that 'the dismissal would have occurred regardless of the employee's request for . . . FMLA leave,' the employee must convince the trier of fact otherwise." *Id.*, quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).  It is not necessary that the termination actually be issued, as long as the wheels of termination' had

14

already been put into motion before the requested leave. *Id*.; *Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 654 Fed. Appx. 675, 684 (6th Cir. 2016); *Barnett v. Aultman Hosp.*, 2012 U.S. Dist. LEXIS 156073, * 31 (N.D. Ohio 2012).

Plaintiff asserts that that he produced well for the company, with his sales numbers having exceeded the previous years' numbers by forty-one percent (Complaint, ECF No. 1, PageID 2, ¶ 10).  In addition, Wilson does not report issues with his employment, aside from a personality conflict with his immediate supervisor, Tim Blair. *Id*. at ¶ 11.

Defendant however has provided sufficient documentation, which include an email trail, showing that Wilson was falling below expectations in his job in multiple aspects.

First, both parties acknowledged that this was an at-will position.  Dynasplint's Resource Manual Agreement specifically states that

> I have entered into my employment relationship with DSI voluntarily and acknowledge that there is no specified length of employment.  Accordingly, either DSI or I can terminate the relationship at will, with or without case, at any time, so long as there is no violation of applicable federal or state law.

(Manual, ECF No. 31-1, PageID 383.)  This agreement was signed by Wilson on December 29, 2011.

In its description of Sales Consultant and Sales Manager (as provided to Wilson) Dynasplint specifically set out the roles and responsibilities of this position:

> SALES CONSULTANT AND SALES MANAGER
>
> All lines of communication must be open on a dependable and regular basis.  The office personnel are here to assist and support the sales force.  The Sales Consultant and Sales Manager will be in contact at least once each week for a territory update and new account status report.  This should include all problems, questions,

> concerns and successes that have occurred in the specific territory.
> The Sales Consultant must plan to attend all scheduled Training
> sessions and Sales Meetings.  These meetings are mandatory.

(Motion for Summary Judgment, ECF No. 32, PageID 424, citing Wilson Depo., ECF No. 31-1,

PageID 384.)  Further, Wilson admitted that he had received an employee handbook which listed

the employment requirements as including

- All lines of communication must be open on a dependable and regular basis
- Always follow up promptly
- Keep detailed notes about each call and about each account
- Complete all paperwork as requested
- Track your inventory

(Motion for Summary Judgment, ECF No. 32, PageID 416); (Wilson Depo., ECF No. 31,

PageID 277); see also ECF No. 31-1, PageID 383-387 (Signed acknowledgement that Wilson

had received a copy of the handbook, and relevant pages thereof attached as an exhibit).

First, it appears that despite Wilson's claims, his more recent reported numbers for

monthly fittings and sales did not align with the company quotas.  In addition, there were issues

of Wilson keeping track of his inventory. (Email dated September 4, 2012, ECF No. 31-1,

PageID 352)(Email from Blair asking for his numbers as the board is showing "6"); (Email dated

September 4, 2012, ECF No. 31-1, PageID 352)(Response in which Wilson states "The board is

wrong. 10."); (Email dated November 1, 2012, ECF No. 31-1, PageID 354)(Wilson tells Blair

that he had a slow month [October], "I am working on confirming 12. . . . 12 sucks but if you

consider the progress of the last 2 weeks I am heading into November with full momentum.");

(Wilson Depo., ECF No. 31, PageID 210)("It was a slow month."); (Email dated January 7,

2013, ECF No. 31-1, PageID 355-356)(Email sent by Tina Phillips titled "Below 23", and listing

Wilson's current number at 11); (Wilson Depo., ECF No. 31, PageID 212)("It looks like there

were 23 or fewer fittings."); (Wilson Depo., ECF No. 31, PageID 214)(According to Below 23

email, it looks like Wilson had eleven fittings for the month of December. "If I remember correctly, the winter holiday and the Christmas really did a number on - - looks like there's 27 people here."); (Email dated January 31, 2013, ECF No. 31-1, PageID 364)(Cheryl Burns informing Wilson that he is on the list of "overdue + 120 days" units. The inventory is now considered lost and Wilson will be held financially responsible until the inventory is returned); (Wilson Depo., ECF No. 31, PageID 233)("So this shows two units that had not been returned in the time frame that they were supposed to have been returned.")

Further, the documentation shows that Wilson failed to provide dependable communication within the company such as returning phone calls, answering texts and emails, and attending scheduled conference calls. (Blair Aff., ECF No. 14-3, PageID 68, ¶ 6); (Herman Aff., ECF No. 14-4, PageID 86, ¶ 5); (Email dated February 15, 2013, ECF No. 31-1, PageID 368)(Email from Daniel Shipman advising that Wilson failed to return calls to Kerry); (Wilson Depo., ECF No. 31, PageID 239-240)("No idea [why he would have been asked to call Kerry] But I can speculate and say that there may have been a need to take care of an account . . . or share a prosthetic that we were using." Does not know if not calling her back would have been viewed as a negative on his job performance as "I don't know what the call was about or what it was alluding to."); (Email dated February 15, 2013, ECF No. 31-1, PageID 369)(Stating that Dayton neuro rep, Rebecca Milligan, had an order for Wilson. She left him a voicemail and text message with no response from Wilson); (Wilson Depo., ECF No. 31, PageID 240-241)(Does not remember responding to Rebecca Milligan, but again states he does not know if failing to return calls would be viewed as a negative in his job performance as "I don't know why these calls weren't returned. I don't know what the circumstances were. I don't recall the person, Rebecca. The e-mails don't say what the calls were pertaining to."); (Wilson Depo., ECF No.

31, PageID 241)(As an employee for Dynasplint, part of the job involved returning phone calls);
(Email dated February 4, 2013, ECF No. 31-1, PageID 363)(From Herman to Wilson inquiring
as to why Wilson had missed the conference call that day and asking whether or not Blair had
been made aware in advance); (Email dated February 4, 2013, ECF No. 31-1, PageID
363)(Email response by Wilson to Herman that he had missed the conference call because of a
fitting and his only knowledge of the conference call had come from Stacy's email sent that
morning); (Email dated February 4, 2013, ECF No. 14-3, PageID 76)(Blair asked Stacy
Desmarteau if she had previously sent out any emails regarding the conference call, and if so,
had Wilson been included on that email); (Email dated February 4, 2013, ECF No. 14-3, PageID
75)(Desmarteau responding to Blair that she had sent out the "invites and[ sic] Friday- and sent
reminders this am."); (Wilson Depo., ECF No. 31, PageID 251)(Does not know why he did not
make the Monday February 18, 2013, conference call as it wasn't the date of the doctor's
appointment); (Email dated February 19, 2013, ECF No. 31-1, PageID 373) (Blair trying to
confirm the ride along.  He emailed on Tuesday that "I have tried to call you with no reply since
Friday.  I left you a VM earlier about riding with you tomorrow but have not heard back so I
wanted to make sure I sent you an email as well."); (Wilson Depo., ECF No. 31, PageID
245)(Two of the four days between Blair's unanswered voicemail and his follow up email would
have fallen on a weekend); (Email dated February 19, 2013, ECF No. 31-1, PageID 373)
(Wilson's reply that Blair would "probably want to check with me and CONFIRM next time.
We are in labor and delivery.  There is no way we will be riding together tomorrow."); (Email
dated February 20, 2013, ECF No. 13-1, PageID 374)(Blair contacted Wilson and noted that he
had tried to reach Wilson numerous times since Friday and Wilson had not returned any of his

calls); (Wilson Depo., ECF No. 31, PageID 246)(It was a mutual responsibility to confirm the ride-along.)

Despite understanding that part of the requirement of his employment involved paperwork, Wilson struggled with its timely completion and submission, specifically relating to call logs and his calendar.  Wilson's new employment agreement dated August 1, 2012, was a further reminder as to the required administrative side of his job as it specifically stated "[a]s you are aware, a significant portion of your performance is based on meeting quotas as well as the timely completion of all paperwork.  The timely completion of paperwork is a condition for receipt of bonuses as listed above." (ECF No. 31-1, PageID 391-392.)  Yet Wilson continued to avoid this task. (Motion for Summary Judgment, ECF No. 32, PageID 416); (Wilson Depo., ECF No. 31, PageID 205)(Call logs were a requirement of Tim Blair, his supervisor); (Wilson Depo., ECF No. 31, PageID 216)(Disagrees that calendar entries were a divisional requirement . . . much smaller than a regional requirement."); (Wilson Depo., ECF No. 31, PageID 217-218)("It was Tim's division and it was Tim's requirement.")  The record is replete with several requests for missing paperwork. (Herman Aff., ECF No. 14-4, PageID 86, ¶ 5); (Email dated April 11, 2012, ECF No. 31-1, PageID 346)(Blair asking why he had not yet received call log from Wilson); (Email dated April 11, 2012, ECF No. 31-1, PageID 346)(Wilson responding "No reason. I just plum forgot.  I will send as soon as I get home this evening.  Sorry Tim, I'll do better staying on top of these."); (Email dated April 23, 2012, ECF No. 31-1, PageID 347)( Blair asking for Wilson's call log and paperwork); (Email dated April 25, 2012, ECF No. 31-1, PageID 348)(Blair emailing Wilson to say that he [Blair] should not have to remind Wilson to submit his call logs); (Email dated May 1, 2012, ECF No. 31-1, PageID 349)(Blair to Wilson inquiring as to Wilson's pending billing paperwork from April.  "If any pend to next month, I

will have to take them from you."); (Wilson Depo., ECF No. 31-1, PageID 207)("It looks like out of the 27 units that I had fit that month, that seven of them were still pending paperwork."); (Email dated January 8, 2013, ECF No. 31-1, PageID 357)(Blair's email to Wilson in which he reminds him to "make sure you enter all of your calls on your calendar as you go thru the day. This is not optional, it is a divisional requirement. Thanks."); (Email dated January 8, 2013, ECF No. 31-1, PageID 357)(Wilson responds that entering calls will "slow him down."); (Wilson Depo., ECF No. 31, PageID 218)(entering them into the calendar was going to take time . . . "take an hour or more out of my day . . . to pacify the checklist that needed to be done."); (Email dated January 14, 2013, ECF No. 31-1, PageID 359)(Blair requesting that Wilson complete filling in the call information for two days on his calendar); (Email dated January 14, 2013, ECF No. 31-1, PageID 359)(Email from Blair again reminding Wilson that he needed his calendar completed as he [Blair] needed the information); (Email dated January 14, 2013, ECF No. 31-1, PageID 359)(Wilson's reply expressing his frustration with the administrative side of the job. He argues that his productivity would be better were he not required to enter calendar calls. "This is a motivation killer for me and I would think the bottom line profitability would take precedence over calendar information."); (Wilson Depo., ECF No. 31, PageID 220) (claims that his profitability was 32% higher when he did not need to deal with administrative tasks); (Email dated February 4, 2013 at 9:28 p.m., ECF No. 31-1, PageID 367)(Blair requesting Wilson's Plan of Action.  "I sent you the guidelines last week with a date to be sent to me of Sunday.  I still have not received it and on our call you stated you would have it done tonight and sent to me by tomorrow morning.  Also, please update your calendar for today and Friday."); (Email dated February 4, 2013 at 9:58 p.m., ECF No. 31-1, PageID 366)(Wilson's email response including his plan of action listed in bullet points); (Wilson Depo, ECF No. 31, PageID 236-238)(Does not

20

know why he did not turn in plan of action by Sunday deadline nor by the following work day); (Performance Memo, ECF No. 31-1, PageID 377)(Blair reported that he and Wilson had talked on numerous occasions as to the calendar and call logs. Yet Wilson failed to submit for February 15, 2013); (Herman Aff., ECF No. 14-4, PageID 86, ¶ 8.)

Co-workers and superiors within the company were not the only ones to complain of Wilson's breakdown in communication. Evidence shows that customers also complained of Wilson's failure to respond, follow up, and communicate. (Email dated October 23, 2012, ECF No. 31-1, PageID 353)(From Stacy Desmarteau stating that she had received a complaint from Jenny regarding one of their patients. Wilson had cancelled twice on the patient's fitting, once with no notice. Wilson claimed that the patient did not yet have authorization, however the patient received an authorization letter on the 20th. Jenny called Wilson multiple times in two days and had not heard back); (Email dated February 15, 2013, ECF No. 31-1, PageID 370)(Email from Mir Razvi to Blair asking Blair to contact a patient concerning her issues with Sales Consultant, Troy Wilson); (Email dated February 15, 2013, ECF No. 31-1, PageID 371)(Email from Razvi to Blair again expressing that this patient has concerns with Wilson.)

On November 13, 2012, Dynasplint released via email its policy as to Recording Devices in the Workplace (Dynasplint Policy on Recording Devices, November 13, 2012, ECF No. 31-1, PageID 408-409). The specifics of the policy detailed the impermissible use of technology to record conversations. *Id*. at 409. "Covert/secret recording of any conversations or meetings occurring at the workplace or, conversations or meetings offsite that deal with workplace matters are prohibited." *Id*. It continued to state that "violation of this policy may result in disciplinary action up to and including termination of employment." *Id*. Yet, Wilson admitted to the Human Resources Department, that in direct violation of company policy, he had recorded a

conversation between himself and Blair, unbeknownst to Blair. (Email dated January 23, 2013, ECF No. 31-1, PageID 361)(Email from Human Resources, Melissa Jenkins, in which she states that Wilson had admitted to recording a conversation in violation with company policy); (Herman Aff., ECF No. 14-4, PageID 85, ¶ 5); (Wilson Depo., ECF No. 31, PageID 225)(Does not specifically remember recording a conversation while he with Dynasplint but "would record a conversation because I want to make sure that I could - - could prove whatever was being said in that conversation.")

At the beginning of 2013, Wilson was put on a performance improvement plan. (Email Dated January 23, 2013, ECF No. 31-1, PageID 362-363) (Email sent by human resources referencing Wilson's performance improvement plan.)   A phone conference was held with Wilson to address his performance issues, during which Wilson was told to pay attention to the numbers and daily board as well as improve his communications, using email as a checks and balances and having twice weekly conference calls with Blair. (Notes dated January 24, 2013, ECF No. 31-1, PageID 363); (Blair Aff., ECF No. 14-3, PageID 67, ¶ 5); (Herman Aff., ECF No. 14-4, PageID 86, ¶ 7); (Wilson Depo., ECF No. 31, PageID 228-229.)   In addition, Wilson's territory was cut in half, to allow him to make higher quantity and quality of calls. (Notes dated January 24, 2013, ECF No. 31-1, PageID 363); (Wilson Depo., ECF No. 31, PageID 230)("The territory was very large. It was very difficult to - - to do both territories at the same time.") Finally, Wilson was asked to prepare a plan of action for improving his performance. (Notes dated January 24, 2013, ECF No. 31-1, PageID 363); (Email dated February 4, 2013 at 9:28 p.m., ECF No. 31-1, PageID 367)(Blair requesting Wilson's Plan of Action.  "I sent you the guidelines last week with a date to be sent to me of Sunday.  I still have not received it and on our call you stated you would have it done tonight and sent to me by tomorrow morning.  Also,

please update your calendar for today and Friday."); (Email dated February 4, 2013 at 9:58 p.m., ECF No. 31-1, PageID 366)(Wilson's email response including his plan of action listed in bullet points); (Wilson Depo, ECF No. 31, PageID 236-238)(Does not know why he did not turn in plan of action by Sunday deadline nor by the following work day.)

On February 18, 2013, Blair drafted a written memorandum titled "Performance Memorandum" and sent it to his direct supervisor, Herman, as well as Karen Bruno in the Human Resources Department. (ECF No. 31-1, PageID 377-378); (Blair Aff., ECF No. 14-3, PageID 68, ¶ 10); (Herman Aff., ECF No. 14-4, PageID 86, ¶ 9.)  In the memo Blair noted Wilson's performance inadequacies which included his failures to return phone calls, to attend conference calls, to follow up with reps and managers, and to turn in paperwork on time.  Blair further noted that he had tried to reach Wilson, but could not leave a message because his voicemail was full. *Id.*  After Bruno and Herman had reviewed the Performance Memorandum (on or about February 18, 2013) the decision was made to terminate Wilson. (Blair Aff., ECF No. 14-3, PageID 68, ¶ 11); (Herman Aff., ECF No. 14-4, PageID 87, ¶¶ 13-14).

On February 19, 2013, Blair emailed Wilson stating that "I have tried calling you with no reply since Friday.  I left you a VM earlier about riding with you tomorrow but have not heard back so I wanted to make sure I sent you and[ sic] email as well." (ECF No. 31-1, PageID 373.) Unbeknownst to Blair, Wilson and O'Brien were sent to the hospital on the 19th.  Wilson later confers that information in an email stating "Probably want to check with me and CONFIRM next time.  We are in labor and delivery.  There is no way we will be riding together." *Id.*  Blair followed up with a reply email, inquiring as to O'Brien and the baby, asking for a status update on Wilson, inquiring if the divisional office had been notified, and asking why Wilson had not been in attendance on the conference call on the 18th.  Wilson's email was forwarded on to

Human Resources, where again the decision to terminate Wilson was reiterated. (Email dated February 20, 2013, ECF No. 32-1, PageID 441)(Melissa Jenkins to Bruno that "This guy [Wilson] needs to be terminated . . . and fast!"); (Email dated February 20, 2013, ECF No. 32-1, PageID 444)(Email from Bruno saying "When and if you do hear from Troy. . . . terminate him.").

Wilson did not respond to Blair's further inquiries until he received an email dated February 20, 2013, advising him that his pay had been stopped until he gets in contact with Blair. (ECF No. 31-1, PageID 407).  At that point, Wilson called Blair, and was told of his termination. The Court notes that the documents reflect confusion as to when Blair was to terminate Wilson; however, the decision to terminate Wilson's employment had been consistent since the Performance Memorandum. (Email dated February 20, 2103, 2:00 p.m., ECF No. 32-1, PageID 444)(Bruno telling Blair "when and if you do hear from Troy . . . terminate him."); (Email dated February 20, 2103, 4:07 p.m., ECF No. 32-1, PageID 444)(Blair to Bruno informing her that he spoke with Troy and let him know that he had been terminated); (Email dated February 20, 2103, 4:13 p.m., ECF No. 32-1, PageID 445)(Bruno responding to Blair's email "The direction was to tell him you were stopping his pay and he was to let you know when he was returning to work. He was to contact you before returning to work.  At that point, you would have terminated him.")

Despite the unfortunate timing of events, the record is replete with Wilson's failure to meet his employment criteria, as well as violation of company policy.  This supports Dynasplint's decision to terminate Wilson.  Consistent with the Sixth Circuit's decision in *Gipson*, the process to terminate began on February 18, 2013, when Blair submitted his Performance Report and both Bruno and Herman advised Blair to terminate Wilson.  As such,

there is not a genuine issue of material fact as to a causal connection between FMLA and Wilson's termination.

**Conclusion**

Considering the pleadings, depositions, and affidavits, there is not a genuine issue of material fact as to whether or not Wilson provided proper notice nor whether there was a causal connection between exercise of FMLA right's and his termination.   Defendant is therefore entitled to judgment as a matter of law.   Defendant's motion for summary judgment is GRANTED and the Clerk will enter judgment dismissing this case with prejudice.


April 3, 2017.

s/ *Michael R. Merz*

United States Magistrate Judge